OSCN Found Document:BERRY AND BERRY ACQUISITIONS v. BFN PROPERTIES

 

 
 

 
 BERRY AND BERRY ACQUISITIONS v. BFN PROPERTIES
2018 OK 27
Case Number: 114442
Decided: 04/03/2018
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2018 OK 27, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

BERRY AND BERRY ACQUISITIONS, LLC, d/b/a PARK HILL NURSERY, BURL R. BERRY, and BOB R. BERRY, Plaintiffs and Counter-Defendants/Appellants and Counter-Appellees,
v.
BFN PROPERTIES LLC, and BFN OPERATIONS LLC, Defendants and Counter-Plaintiffs/Appellees and Counter-Appellants. )

ON APPEAL FROM THE DISTRICT COURT OF CHEROKEE COUNTY,
STATE OF OKLAHOMA, HONORABLE DARRELL G. SHEPHERD

Â¶0 On December 7, 2010, Insight Equity, a private-equity firm headquartered in Southlake, Texas, purchased Berry Family Nurseries, a nationwide wholesale nursery company headquartered in Tahlequah, Oklahoma, for $160 million. The Purchase Agreement entered into by the parties contained a Texas choice-of-law provision. The Agreement also contained a five-year non-compete provision, prohibiting the owners of Berry Family Nurseries, Bob Berry and Burl Berry, from owning a competing wholesale nursery company until December 7, 2015. Park Hill Nursery, a nursery also located in Tahlequah, Oklahoma, and owned by the Berrys, was not included in the Agreement, but the Agreement allowed the Berrys to continue to own and operate Park Hill Nursery so long as it did not compete with the newly formed BFN Operations. The parties performed under the terms of the Agreement for approximately three years until the Berrys, through Park Hill Nursery, began selling to several of BFN's largest customers. The Berrys filed an action in the District Court of Cherokee County, seeking a declaration that the restrictive covenants were unenforceable and void under Oklahoma law. BFN filed a counterclaim, seeking injunctive relief and monetary damages for the Berrys' breach of the covenants. Upon review, we conclude the Texas choice-of-law provision is valid, and the non-compete is enforceable under Texas law. The Berrys breached the non-compete, and Park Hill Nursery tortiously interfered with the parties' Agreement. BFN was entitled to injunctive relief through December 7, 2015, and is also entitled to monetary damages. The trial court's determination that BFN is entitled to attorney's fees is not a final judgment, and appeal of that issue is premature.

TRIAL COURT'S ORDER AFFIRMED IN PART AND REVERSED IN PART;
CAUSE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH
TODAY'S PRONOUNCEMENT

David E. Keglovits, Amelia A. Fogleman, Justin A. Lollman, GableGotwals, Tulsa, OK, for Plaintiffs and Counter-Defendants/Appellants and Counter-Appellees

Wayne Bailey, Bailey Law, PLC, Tahlequah, OK, for Plaintiffs and Counter-Defendants/Appellants and Counter-Appellees

James M. Reed & John T. Richer, Hall, Estill, Hardwick, Gable, Golden, & Nelson PC, Tulsa, OK, for Defendants and Counter-Plaintiffs/Appellees and Counter-Appellants

Robert K. Wise & Thomas F. Lillard, Lillard Wise Szygenda PLLC, Pro Hac Vice, Dallas, TX, for Defendants and Counter-Plaintiffs/Appellees and Counter-Appellants

GURICH, V.C.J.

Facts & Procedural History 

Â¶1 Bob Berry, who resides in Tahlequah, Oklahoma, has been a nurseryman and businessman for more than fifty years. In the 1960s, Bob began working in the nursery business in Tahlequah, and in the early 1970s, he founded Midwestern Nursery. Bob grew and developed Midwestern Nursery, which later became American Nursery Products, and eventually took the company public. Upon his departure from American Nursery Products in the early 1990s, Bob and his son, Burl Berry, who also lives in Tahlequah, formed Tri-B Nursery. The Berrys purchased land near Hulbert, Oklahoma, and began operations in 1992. Wal-Mart was Tri-B Nursery's first customer in the spring of 1993.

Â¶2 In the late 1990s, Tri-B Nursery purchased its first out-of-state nursery, Judkins Nursery, with one location in Tennessee. The Berrys then acquired a nursery in Quincy, Florida, and subsequently bought Zelenka Nursery out of bankruptcy, thereby acquiring another nursery in Tennessee and nurseries in both Michigan and North Carolina. The Berrys then purchased an Oregon nursery, Zelenka West, out of bankruptcy. With such acquisition, Tri-B Nursery, or Berry Family Nurseries as it became known, emerged as one of the largest, if not the largest wholesale nursery business in the United States. Berry Family Nurseries specialized in the sale of trees, shrubs, rose bushes, and perennials to national and regional retailers including Wal-Mart, Home Depot, Lowe's, Sam's Club, K-Mart, ShopKo, Rural King, and Meijer, and generated hundreds of millions of dollars in sales. Berry Family Nurseries maintained offices in Tahlequah, Oklahoma, and Grand Haven, Michigan, and employed more than 400 people at seven nurseries in six states.

Â¶3 The Berrys also owned Sanders Nursery and Distribution Center, a retail nursery business with locations in Wagoner County and Rogers County, Oklahoma. Bob also owned an interest in a California wholesale nursery, Rosetree Nursery, that specialized in rose sales. In 2009, the Berrys purchased Park Hill Nursery (Park Hill), a nursery located in Tahlequah. At the time of the purchase, Park Hill was roughly 300-350 acres, and the Berrys paid just over $3 million for the sale. Park Hill was a supplier to Berry Family Nurseries and employed about 150 people. Until recent events, Park Hill was not a competitor to Berry Family Nurseries.

Â¶4 In early 2010, Berry Family Nurseries was heavily indebted and facing pressure from its lenders to infuse more than $20 million of equity into the business. The Berrys engaged a business broker to find an investor for Berry Family Nurseries. In the spring of 2010, the broker for the Berrys approached Insight Equity, a Texas investment company with headquarters in Southlake, Texas, about investing in Berry Family Nurseries. Insight Equity, a private-equity firm specializing in the acquisition of middle-market companies, was interested in Berry Family Nurseries because of its national scope and customer base. Insight Equity saw the opportunity to expand Berry Family Nurseries by acquiring other wholesale nurseries and to make Berry Family Nurseries more profitable by strengthening management and consolidating decentralized administrative functions.

Â¶5 In mid-2010, Insight Equity sought to purchase Berry Family Nurseries and negotiations began. The Berrys were represented by counsel from both Oklahoma and Texas, and Insight Equity was represented by counsel from Texas. Negotiations were conducted primarily by phone calls and email exchanges and took the better part of six months to finalize. During Insight Equity's due diligence efforts, Insight Equity partners traveled to each of the nurseries owned by Berry Family Nurseries in Oklahoma, Florida, Michigan, Oregon, Tennessee, and North Carolina. In August of 2010, the Berrys met with Insight Equity partners at their Southlake, Texas office and signed a Letter of Intent regarding the eventual purchase of Berry Family Nurseries.

Â¶6 In November of 2010, Insight Equity formed BFN Properties and BFN Operations (BFN) to make the acquisition.[1] All of BFN's officers were Insight Equity partners who lived, worked, and maintained offices in the Insight Equity Southlake, Texas office. BFN opened and maintained bank accounts with several Dallas-area banks, and although BFN registered to do business in Oklahoma, BFN's Application for Employer Identification Number, filed with the federal government shortly after BFN's formation, listed Tarrant County, Texas, as BFN's principal place of business.

Â¶7 On December 7, 2010, the deal closed with BFN electronically signing the Purchase Agreement (Agreement) in Texas and the Berrys electronically signing the Agreement in Oklahoma. Pursuant to the Agreement, BFN purchased Berry Family Nurseries for $160 million. Park Hill was not included in the sale, but the Agreement included a three-year option allowing BFN to purchase Park Hill.[2] Sanders Nursery and Rosetree Nursery were also not included in the sale. The $160 million purchase price included assets of the business, debt assumption by BFN, and the Park Hill Purchase Option. The Berrys received millions of dollars in cash at closing, an "earn out" pursuant to which they could have earned tens of millions of dollars more based on BFN's financial performance, and the right to receive a portion of the proceeds from any profitable sale of BFN. At closing, BFN also paid millions of dollars to the Berrys' creditors, repaid a $30 million term loan, which released Bob and Burl from personal liability, and paid $21 million on a revolver note reducing the Berrys' personal liabilities.

Â¶8 The Agreement entered into by the parties contained a choice-of-law provision that provides that the Agreement "shall be governed by and construed in accordance with the domestic Laws of the State of Texas . . . ."[3] The Agreement also contained a five-year non-compete provision, prohibiting the Berrys from owning a company anywhere in the United States that competed with the business acquired by BFN, i.e., the wholesale nursery business, until December 7, 2015. The non-compete allowed the Berrys to continue to own and operate Park Hill, Sanders Nursery, and Rosetree Nursery so long as such entities did not compete with BFN while being owned by the Berrys.[4] The Agreement also contained a five-year non-solicit provision, prohibiting the Berrys from soliciting the customers acquired by BFN in the purchase until December 7, 2015. Pursuant to separate Employment Agreements, Burl stayed on with BFN as the Chief Operating Officer, and Bob stayed on as the Chief Executive Officer.[5]

Â¶9 For the next three years, both BFN and the Berrys performed under the terms of the Agreement, and business continued as usual for the Berrys. Burl remained largely responsible for BFN's on-the-ground nursery operations and remained intimately involved in BFN's sales to its largest customers. Burl continued to operate Park Hill as well, and in fact, Park Hill became profitable for the first time in large part because it became BFN's largest supplier.[6] In the spring of 2012, pursuant to the terms of the original Agreement, BFN refinanced its revolver loan, which released the Berrys from their guarantees of more than $100 million of bank debt. In June of 2012, the Berrys' employment contracts expired. Bob's contract was not renewed, but he stayed on with BFN as a consultant. Burl renegotiated his employment contract with BFN, and in the fall of 2012, he agreed to remain COO of BFN in exchange for BFN writing off yet another $2.7 million in Park Hill debt.

Â¶10 The three-year purchase option for Park Hill expired on December 7, 2013, with BFN opting not to purchase Park Hill. Less than three weeks later, on December 30, 2013, Burl notified BFN he would be resigning from BFN effective January 31, 2014. On February 21, 2014, BFN executives met with Burl to discuss his exit from the company. As we discuss in greater detail below, four days after that meeting, Burl began selling plants, trees, and shrubs, through Park Hill, directly to BFN's largest customers, including Wal-Mart and Home Depot. Upon learning of Burl's actions, BFN sent letters to its customers on or around March 10, 2014, advising them that Bob and Burl Berry "and entities controlled by either of them" were subject to a non-compete agreement with BFN and that any business dealings with the Berrys were impermissible under such agreement.[7]

Â¶11 On March 11, 2014, Burl Berry, Bob Berry, and Park Hill Nursery filed this action in the District Court of Cherokee County, seeking a declaration that the covenants were unenforceable and void under Oklahoma law. BFN filed a counterclaim against the Berrys, seeking damages and to enjoin the Berrys from violating the covenants. The trial court held a five-day non-jury trial beginning on June 29, 2015, and issued Findings of Fact and Conclusions of Law on August 19, 2015, wherein the court found that the Texas choice-of-law provision was valid and that the covenants were enforceable under Texas law. The court found the Berrys had violated the covenants and enjoined the Berrys from further violations.[8] A Final Journal Entry of Judgment was filed on October 15, 2015.[9] The Berrys and Park Hill appealed, and BFN filed a counter-appeal. We retained the case, and stayed the enforcement of the trial court's injunction.[10] Briefing was completed on January 17, 2017, and we held oral argument in the case on June 5, 2017.[11]

Texas Choice-of-Law Provision

Â¶12 The trial court determined that the Texas choice-of-law provision was valid and should be enforced. The trial court's decision on a choice-of-law issue is reviewed de novo. Edwards v. McKee, 2003 OK CIV APP 59, Â¶ 9, 76 P.3d 73, 76. Under de novo review, an appellate court claims for itself plenary, independent, and non-deferential authority to reexamine a trial court's legal rulings. Kluver v. Weatherford Hosp. Auth., 1993 OK 85, Â¶ 14, 859 P.2d 1081, 1084. Upon examination, we agree with the trial court that the Texas choice-of-law provision is valid and enforceable.

Â¶13 In Krug v. Helmerich & Payne, Inc., 2013 OK 104, Â¶ 35, 320 P.3d 1012, 1022, we said:

Parties initiate contracts to provide a degree of certainty in their business transactions. The courts cannot make a better contract for the parties than they executed themselves. The essential principle of contract law is the consensual formation of relationships with bargained-for duties. The obvious corollary is bargained-for liabilities for failure to perform those duties.

Parties to a contract are free to specify the rules by which a contract will be enforced, including specification of the law of a particular jurisdiction.[12] "Absent illegality, the parties are free to bargain as they see fit, and this Court will neither make a new contract, [n]or rewrite the existing terms."[13] "[W]e maintain a healthy respect for the power of independent persons to bargain for, or away, contractual provisions and maintain our position that it is not this Court's province to remake contracts to suit the changing whims of contracting parties." In re Kaufman, 2001 OK 88, Â¶ 22, 37 P.3d 845, 855. However, "[f]ulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interest and for state regulation."[14] Thus, "[t]he general rule is that a contract will be governed by the laws of the state where the contract was entered into unless otherwise agreed and unless contrary to the law or public policy of the state where enforcement is sought."[15]

Â¶14 In the case before us, the facts demonstrate a nexus to the state of Texas, thus providing sufficient justification for the parties' Texas choice-of-law provision.[16] In addition, the Berrys concede that if Texas law applies, the covenants are enforceable under that state's law.[17] Therefore, the only issue we must decide is whether application of Texas law violates the public policy of Oklahoma--a determination that hinges on the whether the non-compete is enforceable under Oklahoma law.[18]

Â¶15 Section 217 of Title 15 of the Oklahoma statutes provides that "[e]very contract by which any one is restrained from exercising a lawful profession, trade or business of any kind" is void.[19] However, Â§ 218 provides a statutory exception specifically allowing parties to enter into a non-compete agreement when selling the goodwill of a business. Section 218 states:

One who sells the goodwill of a business may agree with the buyer to refrain from carrying on a similar business within a specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof, so long as the buyer, or any person deriving title to the goodwill from him carries on a like business therein. Provided, that any such agreement which is otherwise lawful but which exceeds the territorial limitations specified by this section may be deemed valid, but only within the county comprising the primary place of the conduct of the subject business and within any counties contiguous thereto.[20]

Â¶16 Section 218 has been in effect since statehood and has remained largely unchanged since that time.[21] This Court has said that the purpose of this statute is to "allow the parties to the transfer of a going business to mutually agree, as a part of the value of the business transferred, that the transferee will be protected from his transferor who might use his previously acquired experience, contacts and expertise to promote his own interests in the same field of business in competition with his transferee." Farren v. Autoviable Servs. Inc., 1973 OK 4, Â¶ 5, 508 P.2d 646, 648. This Court has held that "[i]n Oklahoma restraints of trade are permitted in connection with the sale of business, trade, or professional practice, the permissible limits being fixed by statutes which declare such agreements void only as to an excess of time or space . . . ." Wesley v. Chandler, 1931 OK 477, Â¶ 0, 3 P.2d 720, 720. We have consistently upheld non-compete agreements to protect business goodwill pursuant to Â§ 218.[22]

Â¶17 In the case before us, neither party disputes that the non-compete was included in the Agreement to protect the business's goodwill. Nor is there any doubt that the non-compete, as written, applied to the operations at Park Hill. The only concern then is that the non-compete prevents the Berrys from engaging in a competing business anywhere in the United States--as opposed to "a specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof."[23] However, Â§ 218 explicitly provides that boundaries "which exceed[] the territorial limitations" do not render the covenant invalid. Rather, we limit enforcement of the covenant to those areas authorized by the statute. In this case, Tri-B Nursery, one of the nurseries purchased in the Agreement, is in the same county as Park Hill (Cherokee County). Therefore, limiting the enforcement of the non-compete to its permitted extent would still encompass operations at Park Hill, and the non-compete would be enforceable under Oklahoma law.

Â¶18 Thus, we conclude that enforcement of the non-compete under Texas law does not violate Oklahoma public policy in this case. We need not address whether enforcement of the non-solicit under Texas law violates Oklahoma public policy because the non-solicit "was intended to be ancillary to and complement the [n]on-[c]ompete[],"[24] and the non-compete is enforceable. As we discuss in detail below, the Berrys breached the non-compete, and because the non-solicit was less restrictive than the non-compete, any breach of the non-solicit was also a breach of the non-compete. Accordingly, we affirm the trial court's decision to enforce the parties' Texas choice-of-law provision.[25]

Breach of the Non-Compete 

Â¶19 After hearing five days of testimony, the trial court found the Berrys breached the covenants. "In a non-jury trial the court's findings are entitled to the same weight and consideration that would be given to a jury's verdict." Soldan v. Stone Video, 1999 OK 66, Â¶ 6, 988 P.2d 1268, 1269. Because the trial court is in the best position to evaluate the demeanor of the witnesses and to gauge the credibility of the evidence, we will defer to the trial court as to the conclusions it reaches concerning those witnesses and that evidence. Mueggenborg v. Walling, 1992 OK 121, Â¶ 7, 836 P.2d 112, 114. On appeal, the trial court's findings will not be disturbed if there is any competent evidence to support them.[26] Upon review, we conclude the trial court correctly found the Berrys breached the non-compete.

Â¶20 As mentioned above, after Burl's resignation from BFN, BFN senior executives met with him on February 21, 2014, to discuss his exit from the company. On that same day, after meeting with BFN executives, Burl was contacted by Wal-Mart, BFN's third largest customer, about selling trees and shrubs, through Park Hill, for a Wal-Mart promotion for which BFN was supposed to be the supplier. Burl met with Wal-Mart buyers at Park Hill less than a week later wherein Wal-Mart purchased more than 250,000 trees and shrubs from Park Hill for its promotion for almost $2 million. The trees and shrubs sold to Wal-Mart that day had previously been offered by Park Hill to BFN to help fulfill its obligation to Wal-Mart for that promotion. In fact, the record indicates that on the same day Burl met with Wal-Mart buyers at Park Hill, Burl received a text message from someone at BFN asking if BFN needed to put in a purchase order with Park Hill to "hold all the shrubs, roses and other things they usually get from Parkhill," indicating that had Burl not sold the Park Hill inventory to Wal-Mart for its tree and shrub promotion, BFN would have purchased the inventory and remained the supplier for that promotion.[27]

Â¶21 After Wal-Mart purchased the trees and shrubs for that particular promotion, Burl then continued to sell to Wal-Mart. In an email on March 4, 2014, from Burl to Rob Cowgur, Wal-Mart's head buyer, Burl told Mr. Cowgur: "On other product for the rest of the spring, there are still some items out there that I can tie up for you and bring it into mix with what we have at Parkhill[.] [W]e don't plan on shipping BFN anymore product so we can ship you all of that product as well."[28] Park Hill's sales to Wal-Mart approached $9 million dollars in 2014 and $12 million dollars in 2015. The record is clear that upon Burl's departure from BFN, Park Hill, while still owned by the Berrys, immediately began competing with BFN for Wal-Mart's business.[29]

Â¶22 After Burl's resignation from BFN, Park Hill also began selling directly to Home Depot, which was BFN's second largest customer. On Burl's last day at BFN, January 31, 2014, Park Hill's sales manager, Brett Jones, emailed Home Depot's buyer, Rick Pappas, attaching a Park Hill Plants quote for Home Depot to the email: "I quoted the items that we discussed and items that I thought you might be interested in. I even put a column in for what I would suggest as the retail and calculated what this would yield for a beginning margin. . . ."[30] Mr. Pappas responded: "Brett, I am good with all of the items listed for the program. We would need to get pricing set up and your PBS vendor number as the next steps."[31] Mr. Pappas testified that the "program" referred to in the email was Home Depot's HGTV program, a program that BFN had been selling to Home Depot until Burl's departure.[32] Mr. Pappas also testified that setting up a "PBS vendor number" allowed Park Hill to sell directly to Home Depot.[33]

Â¶23 In an email from Mr. Jones to Mr. Pappas on May 5, 2014, Mr. Jones specifically proposed to sell Home Depot clematises as part of Home Depot's HGTV program. Home Depot accepted the proposal. At his deposition, Mr. Pappas was asked whether this was yet another example of the Berrys, through Park Hill, seeking business from Home Depot. Mr. Pappas stated: "Yes, it was an e-mail to do business with [us]."[34] Regarding a June 17, 2014, email between Mr. Jones and Mr. Pappas, Mr. Pappas testified:

Q: And your email to Jones reads, [t]hese are the heavy-hitters to ship this week. You can build larger orders around the top six--six stores listed here. Did I read that correctly?
A: Correct.
Q: Can you tell us what you're referring to?
A: My highest volume stores on this list.
Q: And did BFN sell any of the stores that are listed in your June 17, 2014 e-mail?
A: Yes.
Q: Would it be fair to say that both BFN and Park Hill were selling plants to those same stores?
A: Yes.[35]

Park Hill's sales to Home Depot in 2014 were approximately $1.4 million dollars and $2.5 million in 2015. The record is clear that upon Burl's departure from BFN, Park Hill, while still owned by the Berrys, immediately began competing with BFN for Home Depot's business. The trial court's finding that the Berrys violated the non-compete is supported by competent evidence and is affirmed.

Injunctive Relief

Â¶24 The trial court issued Findings of Fact and Conclusions of Law on August 19, 2015, wherein the court concluded BFN was entitled to permanent injunctive relief pursuant to 12 O.S. 2011 Â§ 1381.[36] The trial court also concluded BFN was "entitled to an equitable extension of the Covenants through June 7, 2017."[37] However, on September 4, 2015, before the Final Journal Entry of Judgment was filed, BFN sought and was granted a Temporary Restraining Order against the Berrys for their continued breach of the covenants after the entry of Findings of Facts and Conclusions of Law. The TRO Application alleged that after the trial court entered its Findings of Facts and Conclusions of Law on August 19, 2015, Park Hill accelerated its sales to certain retailers to sell as many plants as possible before the final judgment was entered and hosted Home Depot's plant buyers at its nursery on August 25, 2015, to garner additional Home Depot business. On October 15, 2015, the Final Journal Entry of Judgment was filed. Because of the Berrys' violation of the court's Findings of Facts and Conclusions of Law, the court again extended the duration of the covenants and enjoined the Berrys until August 20, 2017, from owning a wholesale nursery that sold to or solicited business from any national or regional retailer, including Wal-Mart and Home Depot.[38]

Â¶25 "Matters involving the grant or denial of injunctive relief are of equitable concern." Dowell v. Pletcher, 2013 OK 50, Â¶ 5, 304 P.3d 457, 460. A court sitting in equity "exercise[s] discretionary power," and the granting of an injunction "rests in the sound discretion of the court to be exercised in accordance with equitable principles and in light of all circumstances." Id. Â¶ 6, 304 P.3d at 460. However, an "[i]njunction is an extraordinary remedy that should not be lightly granted," id., and "[e]ntitlement to injunctive relief must be established in the trial court by clear and convincing evidence . . . ."[39] In reviewing the matter, we will consider all of the evidence on appeal, but the trial court's decision "issuing or refusing to issue an injunction will not be disturbed on appeal unless the lower court has abused its discretion or its decision is clearly against the weight of the evidence." Scott v. Okla. Secondary Sch. Activities Ass'n, 2013 OK 84, Â¶ 16, 313 P.3d 891, 896.

Â¶26 The trial court found that BFN had proven by clear and convincing evidence that it was entitled to injunctive relief. We have reviewed the entire record in this case, and we find the trial court's determination that BFN was entitled to injunctive relief is supported by the evidence. We affirm this portion of the court's order. However, we find no Oklahoma case, and the parties cite to none, wherein this Court has extended the duration of a restrictive covenant beyond the contractually specified timeframe as a remedy for violation of that covenant.

Â¶27 In Brown v. Stough, 1956 OK 3, 292 P.2d 176, this Court upheld a provision within a medical clinic partnership agreement that prohibited a partner who voluntarily withdrew from the partnership from practicing medicine for a period of two years within the county in which the medical clinic was located. On appeal, the plaintiffs asked the Court to "fix the time that the injunction is to commence for its duration of two years as the time the mandate is spread of record." Id., Â¶ 19, 292 P.2d at 181 (emphasis added). The Court specifically declined to extend the injunction beyond the contractually specified time reasoning that the partnership agreement "plainly provide[d] that a member withdrawing shall not practice medicine for a period of two years from the date of his withdrawal," and that the plaintiffs sought "injunctive relief in accordance with the provisions of the contract." Id. The Court concluded that the plaintiffs could not "obtain additional or greater relief than that prayed for in their petition or authorized by the contract sued upon." Id. (emphasis added).

Â¶28 In this case, the parties' Agreement plainly relieved the Berrys from the covenants upon the expiration of the five-year term, which all parties agree was December 7, 2015.[40] Although the Agreement specifically allowed for injunctive relief as a remedy for any breach, nothing in the Agreement suggests either party contemplated or agreed to an extension of the covenants beyond December 7, 2015, as part of any injunctive relief that might issue. Thus, we reverse that portion of the trial court's judgment extending the duration of the covenants for an additional twenty months through August 20, 2017.

Damages

Â¶29 BFN also sought damages for the Berrys' breach of the covenants, specifically for lost profits on the Home Depot and Wal-Mart accounts for the years 2014, 2015, 2016, 2017, and 2018 (2014--2018). BFN's expert calculated such lost profits at $8,212,404.00.[41] The Berrys offered no evidence, by way of expert testimony or otherwise, to dispute BFN's calculation of such damages. Rather, the Berrys' sole argument at trial and on appeal is that the Berrys' breach was not the cause of BFN's damages with regard to sales to Wal-Mart and Home Depot. The trial court's only finding on damages was: "[B]FN failed to establish it would have continued to sell to Wal-Mart and Home Depot but for the interference of the Berrys or Park Hill. Therefore, no monetary damages are awarded."[42] For the reasons set forth below, we reverse the trial court's finding that BFN was not entitled to monetary damages for the Berrys' breach.

Â¶30 Much was made at trial about the unique purchasing cycle of the nursery industry. At trial, Burl explained the nursery planting cycle as follows:

[W]e go through the planting process. We have to plant -- we have to plant in the spring of the year our bare root trees. You've got to typically plant the bare root trees in January, February, and March for the whole -- for your fall business or for the next spring. So, you've got to plan it out. . . .

Then, you go to the line review process. . . . The line review process is where you go in to basically see a vendor, i.e., be it Wal-Mart or Lowe's. . . . Typically it happens in July or August. . . . You go in, and you present your prices. You present the products that you have to sell for the next year. And you basically have an idea of the area that you'd like to ship that's compatible to the products you have. And you usually go over for the day, and you make that presentation. And then typically, sometimes it was as late as December before you would hear back from them. . . . And that would be the first time that you could take those areas, arrive and write some preliminary orders and know what inventory you're really going to need. . . .

The next step would be the shipments. Send them back to Wal-Mart. Get PO's. Get hard PO's on them. And plan to ship them in the spring or at the next--at the determined proper time, you know, the next spring.[43]

Â¶31 Wal-Mart's head buyer, Mr. Cowgur, also testified that particularly for a company the size of Wal-Mart, horticulture inventory has to be planned out years in advance to ensure supply is available in the large quantities needed.[44] When asked why Wal-Mart continued to do business with BFN after the March 2014 tree and shrub promotion, Mr. Cowgur responded:

A: We didn't have a choice. We -- BFN is a big company, and they were in our top ten as far as volume goes. And when you look at what it takes to plan out the horticulture business specifically in trees and shrubs, long lead times; three, four, five, six, sometimes seven years on product. And quite frankly, you know, so many folks have closed up shop. We -- we needed product to be able to sell to our customer. So not that we wanted to, but we did. . . . I'm just saying there was no other product available anywhere else, so we didn't have a choice. Whether we wanted to or not, that's irrelevant.[45]

Â¶32 With regard to the Home Depot account, Burl testified at trial that he and Mr. Pappas had previously discussed an order of more than twenty thousand hydrangeas that were originally supposed to have been shipped to Home Depot in the spring of 2014 through BFN. When asked if prior to his departure from BFN, whether he "anticipated that that product would be shipped to Home Depot under BFN[,]" Burl responded, "[p]rior to my leaving, yes, that was our plan."[46] In addition, when asked whether Park Hill anticipated selling inventory already in the ground to BFN for the spring 2014 season so that BFN could then sell it to Wal-Mart, Burl replied, "[n]ot only Wal-Mart. Lowe's . . . Home Depot, any accounts."[47]

Â¶33 A claim for lost profits need not be proven with "absolute certainty," and "[i]n essence, what a [party] must show for the recovery of lost profits is sufficient certainty that reasonable minds might believe from a preponderance of the evidence that such damages were actually suffered.'"[48] Upon Burl's departure from BFN on January 31, 2014, Park Hill immediately began selling inventory directly to Wal-Mart and Home Depot--inventory that Burl specifically testified was to be sold to BFN for the spring 2014 season so BFN could sell to Wal-Mart and Home Depot. The question then is not whether the Berrys' breach caused BFN damages--it most certainly did--the question, rather, is what are BFN's damages? On remand the trial court shall determine BFN's damages for lost profits on the Home Depot and Wal-Mart accounts. Although a "non-breaching party may not receive more in damages than he might or could have gained from full performance" of the contract, we make no determination whether BFN is entitled to damages beyond December 7, 2015, and leave that question to the trial court to determine on remand.[49]

Tortious Interference

Â¶34 BFN also alleged that Park Hill tortiously interfered with BFN's Agreement with the Berrys.[50] BFN argues that "[b]ecause the sales to Wal-Mart and Home Depot in violation of the Covenants were all made by Park Hill, the damages from the Berrys' breach of the Covenants and Park Hill's interference with them are the same."[51] The trial court found "Park Hill tortiously interfered with the Covenants"[52] because Park Hill "intentionally and knowingly" participated in the violation.[53] However, the trial court found BFN "failed to prove monetary damages."[54] The Berrys made no claim of error on appeal with regard to the court's finding that Park Hill tortiously interfered with the Agreement.[55] Thus, the trial court's finding remains undisturbed in that regard, and the only issue on appeal is whether the trial court correctly concluded BFN failed to prove monetary damages.

Â¶35 Because we are remanding the case to the trial court to determine BFN's damages for the Berrys' breach, we also remand the case for the trial court to reconsider damages with regard to BFN's tortious interference claim against Park Hill. Although BFN agrees that damages from the Berrys' breach and Park Hill's interference are the same, BFN is entitled to reassert its claim for punitive damages against Park Hill on remand upon the trial court's determination of BFN's damages for lost profits on the Home Depot and Wal-Mart accounts.[56] In addition, on remand, Park Hill is entitled to a reduction of $439,000.00 on any judgment against it as the trial court correctly concluded BFN owed Park Hill $439,000.00 on an open account.[57]

Attorney's Fees 

Â¶36 The Final Journal Entry of Judgment also concluded that BFN, as the prevailing party, was entitled to reasonable attorney's fees with the "amount [to] be determined by separate application."[58] Although the trial court did not specify whether it was awarding attorney's fees to BFN under Texas or Oklahoma law, BFN sought attorney's fees pursuant to Section 38.001(8) of the Texas Civil Practice & Remedies Code.[59] The Berrys appealed the trial court's finding, asserting that the trial court erred "in ruling BFN is entitled to attorneys fees and costs . . . under Â§ 38.001(8) of the Texas Civil Practice and Remedies Code" because, among other reasons, the court "erred procedurally in not allowing the issue to be fully briefed by both parties."[60] Because the trial court did not set an amount for attorney's fees in the Final Journal Entry of Judgment, that portion of the judgment is an interlocutory ruling. An order granting attorney's fees, but not determining the amount is not a final judgment, and appeal of this issue is premature. [61] Because the trial court's ruling is not a final order in this regard, either party may ask the trial court to reconsider the ruling. Liberty Bank & Trust Co. of Okla. City, N.A. v. Rogalin, 1996 OK 10, Â¶ 14, 912 P.2d 836, 839 (stating that an interlocutory order is "subject to trial court modification"). In that same vein, because the trial court's ruling on the issue remains open to modification, any ruling regarding attorney's fees, is "subject to subsequent examination on timely appeal" by either party. Id.

Conclusion

Â¶37 The trial court correctly enforced the parties' bargained-for Texas choice-of-law provision, and under Texas law, the non-compete is valid and enforceable. The trial court also correctly concluded that the Berrys breached the non-compete upon Burl's departure from BFN on January 31, 2014. Although the trial court correctly found BFN was entitled to injunctive relief, we reverse that portion of the trial court's judgment extending the duration of the restrictive covenants for an additional twenty months through August 20, 2017. We also reverse that portion of the trial court's judgment finding BFN suffered no damages from the Berrys' breach or from Park Hill's tortious interference. We affirm the trial court's finding that BFN owed Park Hill $439,000.00 on an open account. That portion of the trial court's order awarding attorney's fees to BFN is not a final judgment, and appeal of that issue is premature. The case is remanded to the trial court for further proceedings consistent with this opinion.

TRIAL COURT'S ORDER AFFIRMED IN PART AND REVERSED IN PART;
CAUSE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH 
TODAY'S PRONOUNCEMENT

Â¶38 Combs, C.J., Gurich, V.C.J., Kauger, Winchester, Reif and Wyrick, JJ., concur;

Â¶39 Colbert, J., concurs in result;

Â¶40 Edmondson, J., not participating.

FOOTNOTES

[1] BFN Operations was formed to hold the assets of the company. BFN Properties was formed to hold the real property.

[2] The record indicates the sale of Park Hill's business and assets would have created a large tax liability for the Berrys, so at the Berrys' urging, the Agreement did not provide for the sale of Park Hill.

[3] Record on Appeal, Non-Jury Trial Proceedings, Defs.' Ex. 26, at 56.

[4] Pursuant to the terms of the Purchase Option Agreement, the Berrys were free to sell Park Hill upon the expiration of the three-year option, and the purchaser of Park Hill was not prohibited from competing with BFN. Jack Waterstreet, an executive for BFN, testified that initial drafts of the Agreement contained only "a blanket non-competition," but that the Berrys specifically negotiated the non-compete to allow them to continue to own and operate Park Hill, Sanders Nursery, and Rosetree Nursery so long as such entities did not compete with BFN. Record on Appeal, Non-Jury Trial Proceedings at 972.

[5] Each Employment Agreement had a choice-of-law provision that provides that the Employment Agreement "is governed by and shall be construed in accordance with the laws of the State of Oklahoma." Record on Appeal, Non-Jury Trial Proceedings, Pls.' Ex. 420, at 4; Ex. 421, at 4.

[6] The record indicates Park Hill's sales to BFN increased from about $2.4 million in 2011 to about $8.9 million in 2013. The Berrys' equity in Park Hill more than doubled during that time, increasing from about $3.6 million in 2010 to about $8.9 million in 2013.

[7] Record on Appeal, Non-Jury Trial Proceedings, Pls.' Ex. 349.

[8] The Findings of Fact and Conclusions of Law are discussed in detail throughout the remainder of this opinion.

[9] The Findings of Fact and Conclusions of Law were incorporated into the Journal Entry of Judgment. Record on Appeal at 1066.

[10] During the pendency of the appeal, we remanded the case to the trial court to determine whether a bond should be posted as a condition of the stay. The trial court denied BFN's request for bond, and we left that decision undisturbed.

[11] On June 23, 2016, BFN filed a suggestion of bankruptcy, notifying this Court that it had filed for bankruptcy. We stayed proceedings in this Court on June 24, 2016. On July 21, 2016, we lifted the stay upon notification from the parties the automatic bankruptcy stay had been modified in part to allow this appeal to proceed. The parties then sought, and were granted, several briefing extensions.

On March 13, 2017, BFN filed a "Notice of Assignment of Judgment," notifying the Court that on January 10, 2017, BFN had assigned all of its rights, title, and interest in and to the Journal Entry of Judgment entered October 15, 2015, to Nursery Solutions, LLC, a Texas company. The Berrys now argue that BFN no longer has standing to pursue the appeal. Upon consideration, we conclude BFN has standing to continue to pursue the appeal. After oral argument, the Berrys filed a Motion to Supplement the Record on Appeal, which BFN opposed. That motion is denied.

[12] Williams v. Shearson Lehman Brothers, Inc., 1995 OK CIV APP 154, Â¶ 17, 917 P.2d 998, 1002.

[13] JPMorgan Chase Bank, N.A. v. Specialty Rests., Inc., 2010 OK 65, Â¶ 9, 243 P.3d 8, 13. See also 15 O.S. 2011 Â§ 152 ("A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful.").

[14] Restatement (Second) of Conflicts of Law Â§ 187 cmt. G.

[15] Williams, 1995 OK CIV APP 154, Â¶ 14, 917 P.2d at 1002. See also Oliver v. Omnicare, Inc., 2004 OK CIV APP 93, Â¶ 4, 103 P.3d 626, 628 ("The general rule [in Oklahoma] is that a contract will be governed by the laws of the state where the contract was entered into unless otherwise agreed and unless contrary to the law of the state where enforcement of the contract is sought."); MidAmerican Constr. Mgmt. v. Mastec N. Am., Inc., 436 F.3d 1257, 1260 (10th Cir. 2006) ("Under the law of the forum state in this case, Oklahoma, 'a contract will be governed by the laws of the state where the contract was entered into unless otherwise agreed and unless contrary to the law or public policy of the state where enforcement of the contract is sought."); Eakle v. Grinnell Corp., 272 F.Supp. 1304, 1308 (E.D. Okla. 2003); ("With respect to contract actions, the general rule under Oklahoma law is that 'contract will be governed by the laws of the state where the contract was entered into unless otherwise agreed and unless contrary to the law or public policy of the state where enforcement of the contract is sought.").

The Berrys ask us to apply the Restatement's most significant relationship test to determine the choice-of-law issue. However, this Court has not adopted the Restatement's most significant relationship analysis in contract cases, and we need not do so today. See Bernal v. Charter Cty. Mut. Ins. Co., 2009 OK 28, Â¶ 12, 209 P.3d 309, 315.

[16] Williams, 1995 OK CIV APP 154, Â¶ 17, 917 P.2d at 1002 ("Nothing in this record demonstrates that the parties' contractual choice of law should not be given effect as written.").

[17] With regard to the non-compete, Texas law allows non-compete agreements to protect business goodwill. The Texas Business and Commerce Code, specifically the Covenants Not to Compete Act, provides that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful." Tex. Bus. & Com. Code Â§ 15.05(a). Similar to Oklahoma law, which we discuss below, the Act also provides a statutory exception specifically allowing parties to enter into a non-compete agreement to protect the goodwill of a business:

Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Id. (emphasis added).

[18] "[A] specific Oklahoma court decision, state legislative or constitutional provision, or a provision in the federal constitution that prescribes a norm of conduct for the state can serve as a source of Oklahoma's public policy." Darrow v. Integris Health, Inc., 2008 OK 1, Â¶ 13, 176 P.3d 1204, 1212.

[19] 15 O.S. 2011 Â§ 217. This Court has said that "'[s]ection 217 prohibits only unreasonable constraints on the exercise of a lawful profession, trade or business.'" Cardiovascular Surgical Specialists, Corp. v. Mammana, 2002 OK 27, Â¶ 14, 61 P.3d 210, 213 (citing Bayly, Martin & Fay, Inc. v. Pickard, 1989 OK 122, Â¶ 11, 780 P.2d 1168, 1172. "To cure an overly broad and thus unreasonable restraint of trade, an Oklahoma court may impose 'reasonable limitations concerning the activities embraced, time, or geographic limitation' but it will refuse to supply material terms of the contract." Id.

[20] 15 O.S. 2011 Â§ 218. This Court has defined goodwill as: "[T]he custom or patronage of any established trade or business; the benefit or advantage of having established a business and secured its patronage by the public. The 'good will' value of any business is the value that results from the probability that old customers will continue to trade with an established concern." Freeling v. Wood, 1961 OK 113, Â¶ 12, 361 P.2d 1061, 1063 (internal citations omitted).

[21] Sections 217 and 218 "were adopted word for word" from the Dakota territories. Key v. Perkins, 1935 OK 142, Â¶ 9, 46 P.2d 530, 531.

[22] See Farren, 1973 OK 4, 508 P.2d 646 (enforcing covenant not to compete where owner of vending machine operation and food service company agreed not to compete in such business in the same county for one year after the closing of a corporate merger which included the sale of goodwill of the business); Griffin v. Hunt, 1954 OK 87, 268 P.2d 874 (enforcing covenant not to compete where veterinarian who sold his practice, including the goodwill of the business, agreed not to operate a veterinary facility in the same county for a specified time); Clare v. Palmer, 1949 OK 8, 203 P.2d 426 (enforcing covenant not to compete where the seller of a drug store and the goodwill of such business agreed not to compete in the same town as the buyer so long as the buyer continued the operation of a similar business in the town); Hartman v. Everett, 1932 OK 460, 12 P.2d 543 (enforcing covenant not to compete where the seller of stock of a publishing company agreed not to edit, publish, or manage a fox, wolf or hound magazine in the same county as the buyer for a period of five years).

[23] 15 O.S. 2011 Â§ 215.

[24] Record on Appeal at 770.

[25] Nichols v. Nichols, 2009 OK 43, Â¶ 10 & n.14, 222 P.3d 1049, 1054 & n.14 ("An appellate court has a common-law duty to affirm a trial judge's decision if it can be supported by any applicable legal theory.").

[26] Soldan, 1999 OK 66, Â¶ 6, 988 P.2d at 1269. Because BFN sought damages only with regard to the Home Depot and Wal-Mart accounts, we need not address whether the Berrys breached the non-compete with regard to other BFN customers including Lowe's and K-Mart.

[27] Record on Appeal at 1426. This much discussed tree and shrub promotion for Wal-Mart was set to take place in March of 2014. The undisputed evidence at trial revealed that BFN had previously been awarded the promotion from Wal-Mart and had planned to supply the promotion with trees and shrubs already in the ground at Park Hill.

[28] Record on Appeal, Non-Jury Trial Proceedings, Defs.' Ex. 117.

[29] The Berrys spent much of their time at trial presenting witnesses who testified that BFN had discontinued its relationship with Wal-Mart when Park Hill began selling to Wal-Mart in March of 2014. However, the record makes clear that BFN had not ended its relationship with Wal-Mart as evidenced by Wal-Mart's purchase of millions of dollars of inventory from BFN after March of 2014. Mr. Cowgur testified that the dollar amount of plants Wal-Mart purchased from BFN after March of 2014 was "between 10 and 15 million dollars." Record on Appeal at 1446. In addition, the record reflects that BFN executives were in daily communication with Wal-Mart buyers attempting to reach an agreement to negotiate pricing with Wal-Mart after the tree and shrub promotion. Record on Appeal at 1465; Record on Appeal, Non-Jury Trial Proceedings, Defs.' Exs. 124--125, 134--137. Regardless, such evidence is irrelevant to the determination of whether the Berrys violated the non-compete.

[30] Record on Appeal at 1641.

[31] Id. at 1639.

[32] Id. at 1602.

[33] Mr. Pappas testified that Park Hill did not have a vendor number until after Burl left BFN and that under Home Depot's vendor system, Home Depot must assign a vendor a number for the vendor to sell plants to Home Depot. Id. at 1598, 1603.

[34] Id. at 1602.

[35] Id. at 1604.

[36] Although Texas law governs the validity and enforceability of the non-compete in this case, the remedy available to enforce such contractual provision is determined by the law of the forum. Consol. Grain & Barge Co. v. Structural Sys. Inc., 2009 OK 14, n.6, 212 P.3d 1168, 1171 n.6; see also Clark v. First Nat'l Bank of Marseilles, Ill., 1916 OK 404, Â¶ 9, 156 P. 96, 98 ("[M]atters respecting the remedy depend upon the law of the place where the remedy is sought to be enforced.").

[37] Record on Appeal at 774 (emphasis added).

[38] The trial court's judgment with regard to injunctive relief provides:

Bob Berry and Burl Berry, directly or indirectly, from the date of this Final Journal Entry of Judgment in this action through August 20, 2017, be and hereby are enjoined and restrained from (1) owning or being an equity owner (other than as an equity holder of less than 2% percent of the issued and outstanding shares of a publicly traded company) within the United States of America, in any business activity or enterprise, including but not limited to, Park Hill, that is a wholesale nursery that sells trees, shrubs, rose bushes, and/or perennials to any national or regional retailer, including, without limitation, Costco, Home Depot, K-Mart, Kroger, Lowe's, Sam's Club, Wal-Mart, Meijer, Shopko, or Rural King, for resale to consumers, and (2) either directly or indirectly, for their own benefit or the benefit of any other person or entity, including, but not limited to, Park Hill, from soliciting, attempting to solicit, calling on, or diverting or attempting to divert from [BFN], the customers identified on Schedule 3.18(a) to the APA, a copy of which is attached hereto as Exhibit A. Bob Berry and Burl Berry are not enjoined from having an ownership in Park Hill, so long as Park Hill refrains from selling trees, shrubs, rose bushes and/or perennials to any national or regional retailer, including, without limitation, Costco, Home Depot, K-Mart, Kroger, Lowe's, Sam's Club, Wal-Mart, Meijer, Shopko, or Rural King, for resale to consumers. The Court shall have continuing jurisdiction to enforce the injunctive relief granted herein.

Id. at 1067.

[39] House of Realty, Inc. v. City of Midwest City, 2004 OK 97, Â¶ 11, 109 P.3d 314, 318 (internal quotation marks omitted).

[40] Record on Appeal at 772.

[41] Record on Appeal, Non-Jury Trial Proceedings, Defs.' Ex. 201.

[42] Record on Appeal at 773.

[43] Record on Appeal, Non-Jury Trial Proceedings at 163--166.

[44] Record on Appeal at 1355.

[45] Id. at 1355 (emphasis added).

[46] Record on Appeal, Non-Jury Trial Proceedings at 403.

[47] Id. at 384.

[48] Florafax Int'l, Inc. v. GTE Market Res. Inc., 1997 OK 7, Â¶ 42, 933 P.2d 282, 296 (emphasis added). In Florafax this Court addressed the standard for assessment of damages for lost profits in a breach of contract case, and specifically discussed lost profits from a third-party collateral contract. In that case, Florafax International, Inc. sued GTE Market Resources for breaching a contract that required GTE to provide telecommunication and telemarketing services to Florafax. However, part of the damages sought by Florafax was profits lost under a collateral contract Florafax had with a third party that was canceled because of GTE's breach of its contract with Florafax. The jury determined that GTE breached its contract with Florafax, and in addition to other damages, awarded Florafax damages for lost profits Florafax would have earned under its collateral contract with the third party.

This Court affirmed the jury's award and found that an award in the form of lost profits is "generally considered a common measure of damages for breach of contract, [and] frequently represents fulfillment of the non-breaching party's expectation interest . . . . [I]t often closely approximates the goal of placing the innocent party in the same position as if the contract had been fully performed." Id., Â¶ 26, 933 P.2d at 292. The Court set forth the following standard for assessing damages for lost profits:

[L]oss of future or anticipated profit--i.e. loss of expected monetary gain--is recoverable in a breach of contract action: 1) if the loss is within the contemplation of the parties at the time the contract was made, 2) if the loss flows directly or proximately from the breach--i.e. if the loss can be said to have been caused by the breach--and 3) if the loss is capable of reasonably accurate measurement or estimate.

Id.

[49] Id., Â¶Â¶ 34--39, 933 P.2d at 295.

[50] "Oklahoma recognizes a tortious interference claim with a contractual or business relationship if the plaintiff can prove (1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage." Wilspec Techs., Inc. v. DunAn Holding Grp, Co., 2009 OK 12, Â¶ 15, 204 P.3d 69, 74.

[51] Combined Answer Brief and Brief-in-Chief of BFN at 38 n.30 (emphasis added).

[52] Record on Appeal at 775.

[53] Id. at 769--70.

[54] Id. at 775.

[55] In Wilspec, we said that a tortious interference "claim is viable only if the interferor is not a party to the contract or business relationship." 2009 OK 12, Â¶ 15, 204 P.3d at 74. The Berrys did not argue at trial or on appeal that Park Hill was a party to the contract.

[56] "[P]unitive damages are not recoverable solely for breach of contract obligations [but] when a breach of obligations arises from tortious conduct . . . punitive damages may be recoverable." Wilspec, 2009 OK 12, Â¶ 17, 204 P.3d at 76. "In addition to proving the elements of a tort, the plaintiff seeking punitive damages for tortious interference with a contract obligation must prove that the defendant acted either recklessly, intentionally, or maliciously by clear and convincing evidence." Id., Â¶ 18, 204 P.3d at 76.

[57] Park Hill alleged in its Petition that BFN owed Park Hill $450,000.00 for failure to pay for products supplied by Park Hill to BFN. BFN asserted setoff as an affirmative defense to Park Hill's open-account claim, alleging that Park Hill owed $48,285.00 to BFN and that any judgment entered in Park Hill's favor should be set off in this amount. On this issue, the trial court found that "BFN owed Park Hill $439,000.00 at the time of trial" and that "BFN had failed to prove its setoff claim." Record on Appeal at 773.

Although exhibit 177 from the non-jury trial indicates BFN may be entitled to setoff in amount of $48,285.00, the exhibit is not dated. Jack Waterstreet, the BFN executive who testified to the authenticity of the document, testified that the document was an excerpt of the accounts receivable ledger, but Mr. Waterstreet likewise did not provide a date for the document, just that it was made at or near the time of the act. Record on Appeal, Non-Jury Trial Proceedings at 1075. The ledger includes invoices for Park Hill Plants and Park Hill Plants & Trees ranging from August 29, 2013, to June 29, 2014. Other exhibits in the record relied on by BFN, including Exhibit 159 at page 18, do not support BFN's claim for setoff. Page 18 of Exhibit 159 is a chart showing "YTD Cost of Sales Update/Inventory Bridge," and does not reflect any amount owed by Park Hill to BFN. Park Hill did not address BFN's setoff claim in its Combined Reply and Answer Brief on appeal. Regardless, the evidence relied on by BFN is incomplete, at best, with regard to its setoff claim. Thus, we defer to the trial court's finding that BFN failed to prove setoff. The court's judgment is affirmed in this regard.

[58] Record on Appeal at 1068--69.

[59] Compare Veiser v. Armstrong, 1984 OK 61, n.6, 688 P.2d 796, 799 n.6 (stating that in a conflict-of-law analysis "matters of procedure are governed by the law of the forum"), with Boyd Rosene and Assocs., Inc. v. Kansas Mun. Gas Agency, 174 F.3d 1115, 1118--25 (10th Cir. 1999) (concluding that under Oklahoma law, attorney's fees would be considered substantive in a choice-of-law analysis, and thus, the state's law that governs the substantive issues in the case also applies to decide whether attorney's fees are recoverable).

[60] Petition in Error, Ex. C. We note that if Texas law applies, the parties were not given a full opportunity to address whether that state's law allows attorney's fees to employers who seek to enforce restrictive covenants against employees. The issue remains unsettled under Texas law and deserves closer examination by both the trial court and the parties.

[61] See Keel v. Wright, 1995 OK 18, 890 P.2d 1351; see also Beavers v. Byers, 2010 OK CIV APP 79, Â¶ 8, 239 P.3d 484, 487 ("A trial court order determining only a party's entitlement to attorney fees and costs does not constitute a final order."); City of Norman v. Am. Fed'n of State, Cty. & Mun. Emps., 2006 OK CIV APP 137, Â¶ 3, 146 P.3d 872, 872 ("[T]he resolution of the issue of entitlement [to attorney's fees] without a determination as to amount does not constitute a final order, and this appeal must be dismissed as premature.").

Â